IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| LAURENCE STEWART, | CV 15-00084-H-DLC-JTJ |
| Plaintiff, | |
| vs. | FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE |
| SAM JOVANOVICH, | |
| Defendant. | |

Defendant Sam Jovanovich has filed a Motion for Summary Judgment.
(Doc. 74.)  Plaintiff Laurence Stewart filed a response and included an argument
therein for a cross motion for summary judgment.  (Doc. 87.)  Having reviewed
the parties' evidence and arguments, the Court concludes there are genuine issues
of material fact that preclude summary judgment.  The motions should be denied.

**I.  Motion for Summary Judgment Standard**

Summary judgment is appropriate when the moving party "shows that there
is no genuine dispute as to any material fact and the movant is entitled to judgment
as a matter of law."  Fed. R. Civ. P. 56(a).  Under summary judgment practice,
"[t]he moving party initially bears the burden of proving the absence of a genuine
issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir.
2010) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving

1

party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admission, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A), (B).

"Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *Oracle Corp.*, 627 F.3d at 387 (*citing Celotex*, 477 U.S. at 325); *see also* Fed. R. Civ. P. 56(c)(1)(B).  Summary judgment should be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *See Celotex*, 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."

*Id.*

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11. But "[a] plaintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence." *Lopez v. Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc). The opposing party must demonstrate that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," and that the dispute is genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

"In evaluating the evidence to determine whether there is a genuine issue of

fact," the court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Costa Cnty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586 (citations omitted).

## II. Facts

In March 2015, Mr. Stewart was hired as a laundry worker in High Side Unit 1 (HSU 1) at Montana State Prison. (Statement of Undisputed Facts, Doc. 76 ("SUF") at 1.) HSU 1 is a high security compound that houses prisoners classified as Medium I/Restricted Custody or Close Custody. (SUF at 2.) Prisoners at MSP receive an objective classification based on an assessment of risks and needs. (SUF at 3.) HSU 1 houses some of the most dangerous prisoners who are not in locked housing and experiences some of the most active Security Threat Group (STG) activity. (SUF at 4, 6.)

Prisoners who serve as laundry workers will at times have access to the laundry room without supervision of correctional staff. (SUF at 7.) Laundry workers are permitted in the laundry room to prepare bed rolls and organize

4

laundry when new shipments come in.  (SUF at 8.)  A bed roll typically consists of sheets, blankets, pillowcases, and other authorized bedding items.  (SUF at 9.) Laundry workers distribute clothing, linens, and bedding and thus are in a position to distribute extra laundry, clothing items, and other special items.  (SUF at 10, 11.)

In the past, prisoner laundry workers have abused their work position and created special bed rolls to provide unauthorized items to specific prisoners. (SUF 12.)  Unauthorized items can include extra bedding, towels, khakis, socks, briefs, or other laundry items.  (SUF at 13.)  Special bed rolls create both safety and security concerns and have been found to contain contraband, such as weapons, drugs or notes, including STG communications.  (SUF at 14-15.)  Special bed rolls often will be identified either by a list or pieces of paper taped to the individual bed roll.  (SUF at 16.)  Sometimes prisoners will be identified by their STG moniker.  (SUF at 17.)  Prisoners will also trade the special bed rolls for favors or monetary gain.  (SUF at 18.)  Special bed rolls can also contribute to clothing shortages, as prisoners will obtain and retain more items than they should possess. (SUF at 19.)  Excess clothing and linens can also pose a safety and security concern.  For example, prisoners will use excess towels to obstruct views into cells, they will use excess clothing as padding or armor, in order to engage in

violent disturbances, or use excess clothing as masks to avoid the effects of OC spray.  (SUF at 20-22.)

Prisoner laundry workers are required to exchange clothing items in a one-for-one exchange.  When a prisoner drops off a specific item, they receive the same clothing item, of the same size.  (SUF at 23.)  The one-for-one exchange is intended to ensure prisoners do not obtain more clothing or laundry items than allowed by policy, it helps avoid laundry shortages, it prevents excess clothing from becoming contraband for trade and barter, and is intended to ensure prisoners wear properly fitting clothing, i.e., clothing that is not over or undersized for the individual's body type.  (SUF at 24- 27.)  Prisoners are required to wear properly sized clothing for safety and security reasons because baggy, oversized or ill-fitting clothing provides a place for prisoners to conceal and transport contraband, including drugs or weapons.  (SUF at 28-29.)  STGs historically have used specific clothing types or sizes to organize or identify.  (SUF at 30.)  The one-for-one exchange is also intended to avoid special treatment or favors.  (SUF at 31.)  In a prison environment where access to or possession of clothing items is limited, prisoners will use the provision of extra or special clothing items to provide special treatment or trade favors.  (SUF at 32.)

Mr. Stewart was a laundry worker in High Side Unit 1 in April 2015.

6

(Jovanovich Aff., Doc. 76-1 at 2, ¶ 3.)  During the months of March and April

2015, Sgt. Ron McDonald participated in shakedowns of prisoners' cells in High

Side Unit 1 and discovered that some prisoners possessed laundry and towels in

excess of prison policy.  (SUF at 33, McDonald Aff, Doc. 76-2 at 2, ¶¶ 7, 8.)[1]  Sgt.

McDonald testified that he observed Mr. Stewart making special bed rolls, some

of which identified specific prisoners for whom they were made, including some

identified by gang monikers.  (SUF at 34, 35.)[2]  Sgt. McDonald testified that he

gave Mr. Stewart a verbal warning to cease making special bed rolls.  (SUF at 36.)

HSU 1 Unit Manager Sam Jovanovich (hereinafter "UM Jovanovich")

testified that "on occasion" he "identified that the laundry workers, including

Stewart were making special bed rolls for specific inmates."  (SUF at 37,

Jovanovich Aff., Doc. 76-1 at 2, ¶ 4.)  He testified that he also gave Mr. Stewart a

verbal warning that he was not permitted to make or distribute special bed rolls.

(SUF at 38; Jovanovich Aff., Doc. 76-1 at 2, ¶ 11.)

Mr. Stewart contends he never issued special laundry rolls or extra clothing

---

[1]Mr. Stewart contends that between the preceding few months leading to Mr. Stewart being hired and until 4/22/15, there was no unit wide search performed for extra clothing.  (SDF at 4.)

[2]Mr. Stewart contends he is not part of any STG, he has never been part of a STG, and he has never been accused of any STG activity.  (SDF 6.)  To Mr. Stewart's lnowledge, Jeffery Lout is not, nor has he ever been, part of a STG.  (SDF 7.)

7

to anyone, nor did he break any rules pertaining to his position as a Unit Laundry

Worker.  (Statement of Disputed Facts, Doc. 88 ("SDF") at 1.)  Mr. Stewart

contends that Sgt. McDonald never issued him a warning nor confronted him in

any way for any job related issue while Mr. Stewart was a laundry worker.  (SDF

at 17.)

Mr. Stewart contends that the only thing that occurred that could be

considered a warning by any staff member was when UM Jovanovich confronted

Mr. Stewart and his co-worker Jeffrey Lout in regards to a list he found that

contained names and clothing sizes of certain prisoners.  When this occurred Mr.

Stewart had been employed as a laundry worker for only about a week or so.[3]  Mr.

Lout made it clear to UM Jovanovich that the list was his doing and that it was

made to supply kitchen workers with clean clothing as well as a couple of

prisoners that needed very large sizes.  UM Jovanovich stated that he did not want

them to use lists but that he could understand making a special bed roll for one

particular prisoner.  (SDF at 18.)  Mr. Stewart contends that aside from this one

occasion when UM Jovanovich confronted Mr. Lout and Mr. Stewart regarding

the list, no other MSP employee confronted Mr. Stewart for anything pertaining to

---

[3]In his Amended Complaint, Mr. Stewart alleged he was hired as a laundry worker on March 11, 2015.  (Amd. Cmplt., Doc. 11 at 31.)

his laundry job.  (SDF at 22.)

The record indicates that Mr. Stewart submitted approximately six grievances in the eleven days prior to his being fired from his laundry job.  (See Doc. 88-1 at 15-23; grievances dated April 11, 2015 - April 19, 2015.)  One issue raised in these grievances was about clothing shortages at the laundry, which had been occurring since before Mr. Stewart was hired.   (Amd. Cmplt., Doc. 11 at 31.) Specifically, on April 16, 2015, while still a laundry worker in HSU 1, Mr. Stewart sent UM Jovanovich an Informal Resolution.  (SUF at 39.)  The Informal stated,

> For the last 2-3 weeks we have run out various clothing sizes.  We need more 3 and 4x tops and bottoms est. 40 of each needed.  5x and 7x shirts est. 10 of each needed.  Also we need about 70 towels and a few packs of XL underwear.  Currently people are wearing improperly sized or dirty clothes and using dirty towels.  We have an over abundance of XL and 2X but many do not wear those sizes.

On April 22, 2015, the day Mr. Stewart was fired from his laundry job, UM Jovanovich denied the informal and responded as follows:  "You as the laundry workers are not to be giving out overly large clothing–also, it is to be 1 for 1.  If you cannot follow these rules we need to fix that."  (Doc. 76-4 at 1.)

In the Amended Complaint, Mr. Stewart alleged that on or about April 18, 2015, he put a stack of ten informal grievance forms in the dayroom and told everyone to file a grievance if they wanted new clothes.  He alleged that

approximately six people submitted grievances. (Amd. Cmplt., Doc. 11 at 31.)

The record indicates that Prisoner Isaac Chapa filed an informal resolution form

on April 15, 2015 regarding laundry issues that was responded to by UM

Jovanovich on April 22, 2015.  (Doc. 88-1 at 25.)  Prisoner Walter Cassell

testified that he submitted an informal regarding the shortage of clothing in HSU-1

that was returned by UM Jovanovich due to too many grievances.  (Cassell Aff.,

Doc. 88-1 at 26.)  Prisoner Fred Lawrence testified that on April 18, 2015, he

received a memo from UM Jovanovich stating that his informal about clothing

pass was denied for submitting multiple grievances on the same issue.  (Lawrence

Aff., Doc. 88-1 at 28.)

In the Amended Complaint, Mr. Stewart alleged that on April 20, 2015, he

and Mr. Lout were confronted by Lt. Jovanovich about the clothing shortage.  Lt.

Jovanovich stated that he would order more clothes and told them that if they had

an issue they should file an OSR (offender staff request) and not grievances

because grievances required more work to process.  (Amd. Cmplt., Doc. 11 at

31-32.)  Mr. Stewart contends that this occurred just days before he was fired on

April 22, 2015 and right about the time UM Jovanovich would have received the

grievances from Mr. Stewart's blockmates.  Mr. Stewart contends that just after

this UM Jovanovich would have read through the grievances on his desk and

realized that Mr. Stewart had encouraged others to file grievances on the clothing

shortage issue.  (SDF at 33.)

Sgt. McDonald testified at some point he observed Mr. Stewart making

special bed rolls again and made the decision to terminate Mr. Stewart from his

laundry job.  (SUF at 42, 43; McDonald Aff., Doc. 76-2 at 5, ¶¶ 32-33.)  Mr.

Stewart contends that he had not been in the laundry room the morning Sgt.

McDonald claims to have observed him passing out special bed rolls/clothing.

(SDF 40.)

On April 22, 2015, Sgt. McDonald informed Mr. Stewart and Mr. Lout that

they were fired from their Unit Laundry Positions.  When Mr. Stewart asked why

Sgt. McDonald stated "Apparently you gave out clothes when you were not

supposed to."  Mr. Stewart then asked if he was going to receive a write up and

McDonald stated "'I don't think so, it's just not working out."  (SDF at 23.)

Sgt. McDonald completed an incident report on the job removal of Mr. Lout

and Mr. Stewart indicating it occurred on April 22, 2015 at 0745.  The report

states as follows:

> On above date and approximate time, I Sgt McDonald removed the
> above two inmates from doing personal laundry in HSU-1.  The two
> inmates were caught saving laundry bundles for other inmates and
> were told not to do so. They were also told that if this happened
> again, they would be removed. On the above date, IPS shook down

UD block and removed approximately 40 sets of state laundry from 5
cells. These two inmates were told by me that they were removed
from their jobs effective immediately. E.O.R.

(Incident Report, Doc. 88-1 at 33.)  Mr. Stewart contends that the search on April

22, 2015 by IPS only encompassed one of eight blocks.  (SDF at 5.)

Sgt. McDonald completed a supplemental incident report on the job removal

on May 18, 2015 which states as follows:

This is a supplemental report regarding the removal of the above
inmates from laundry which was written on 4-22-15. Prior to their
termination, I Sgt McDonald observed both inmates passing extra
laundry to inmates on UD block. Shortly after that, IPS had shaken
down UD and remove big amount of extra laundry. This lead to the
termination of employment from the unit laundry.

(Doc. 88-1 at 36.)

Sgt. McDonald testified that he decided to terminate Mr. Stewart from his

laundry position, that it was within his power, he did not need the permission of

UM Jovanovich, and he was not ordered to fire Mr. Stewart.  (SUF at 43, 44.)  Sgt.

McDonald does not recall being aware of any grievances filed by Mr. Stewart,

regarding his laundry position, in April of 2015.  (SUF at 45.)

On April 24, 2015, shortly after he was terminated from his laundry

position, Mr. Stewart signed an informal resolution form stating:

I was informed by Sgt. McDonald that my co-worker and myself were
being removed from our unit laundry job because we "gave out

12

clothes when we were not supposed to."  I asked if I was getting some
kind of write up.  Sgt. McDonald said "I don't think so, it's just not
working out."  He told me it was Sam's decision.  I was pretty
confused and angry since I got fired for seemingly no reason.  I and
my co-worker were replaced within an hour.  Later that night I
recived [sic] an Informal from Sam I had submitted about ordering 3
and 4x clothes and all became clear. He said in the informal "You as
the laundry workers are not to be giving out overly large clothing –
also it is to be 1 for 1 if you cannot follow the rules we need to fix
that."  In the day since I also discovered that UM Sam returned most
of the informals that other people on my block filled out pertaining to
the laundry.  Many of them said they were returned for "submitting
multiple grievances in reference to the same issue(s)."  (Not
processed)

(SUF at 50; Doc. 76-9.)

Sgt. McDonald contends that he informed UM Jovanovich of the basis for

Mr. Stewart's termination after the fact.  (SUF at 46.)  UM Jovanovich did not

pursue a formal write up, determining it was better to resolve the issue at the

lowest informal level.  (SUF at 47.)  UM Jovanovich determined termination from

employment should not result in formal discipline to Mr. Stewart because he had

already lost his job.  (SUF at 48.)

On June 19, 2015, Cheryl Bolton, Administrative Officer in the Warden's

Office, sent a response to an OSR Mr. Stewart had submitted to Department of

Corrections Director Mike Batista.  The response stated:

While Living in HSU1, you were removed from your work
assignment as a unit laundry worker for continued issues pertaining to

> your job performance. These issues included issuing special laundry
> rolls to certain offenders, which the Unit Manager gave you a
> warning about, as well as providing additional inmates extra laundry
> on a separate occasion, which was observed by security staff prior to
> your work assignment removal. I realize there have been complaints
> about clothing shortages in HSU1, but giving special laundry rolls to
> a list of people as well as providing extra laundry to others was not an
> appropriate resolution and only added to the laundry shortage. ….
> You were not issued a write-up as Unit Manager Jovanovich chose to
> resolve the issue at the lowest level and remove you from your job in
> lieu of writing you up.

(SUF at 54; June 19, 2015 response, Doc. 88-1 at 13.)

Mr. Stewart and Mr. Lout were replaced with two new workers within an hour of being informed that they were fired. (SDF 39.) Shortly after being fired from the laundry position, Prisoner Jeffery Lout who was fired along with Mr. Stewart was given a unit position with equal pay to the laundry position as the Unit Swamper. He received a higher paying Unit Position a short time later. (SDF at 31; Lout Aff., Doc. 88-1 at 1-4.)

In Mr. Stewart's June 8, 2015 reclassification that was reviewed by UM Jovanovich, stated that Mr. Stewart had a good work history for the last six months. (SDF 43.)

## III. Discussion

### A. First Amendment Violation

The required elements of a retaliation claim are the following: "(1) [a]n

assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, . . . that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted).

Here there is a disputed issue of fact regarding whether UM Jovanovich was responsible for firing Mr. Stewart from his job.  While Sgt. McDonald and Jovanovich both testified that it was Sgt. McDonald's decision, Mr. Stewart presented evidence suggesting that UM Jovanovich was involved in that decision. First, in his April 24, 2015 informal grievance Mr. Stewart indicated that when Sgt. McDonald fired him and Mr. Lout, Sgt. McDonald told them that the decision to fire them was "Sam's decision."  (Doc. 76-9 at 1.)  Secondly, Cheryl Bolton's memo to Mr. Stewart on June 19, 2015 in response to his OSR to Director Batista indicated that, "You were not issued a write-up as Unit Manager Jovanovich chose to resolve the issue at the lowest level and remove you from your job in lieu of writing you up."  (Doc. 76-6.)  Defendant argues that this statement just means that Jovanovich "later determined Plaintiff's termination should not result in formal discipline to Plaintiff because Plaintiff already had lost his job."  (Reply Brief, Doc. 89 at 5-6.)  But even if UM Jovanovich later determined that Mr.

15

Stewart should not be disciplined, the Bolton memo indicates that Jovanovich "chose to resolve the issue at the lowest level and remove you from your job . . . " The plainest meaning of these words is that UM Jovanovich chose to remove Mr. Stewart from his job. While Ms. Bolton may have another explanation of what she meant by this statement, it is not in the record.

Thus, there is a disputed issue of fact regarding whether Jovanovich took an adverse action against Mr. Stewart.

Assuming the facts in the light most favorable to Mr. Stewart, that UM Jovanovich made the decision to remove Mr. Stewart from his job, the issue becomes whether or not he did so because of Mr. Stewart's protected activity. "[B]are allegations of arbitrary retaliation" are insufficient to state a claim. *Rizzo v. Dawson*, 778 F.2d 527, 532 n.4 (9th Cir. 1985). While "timing can be properly considered as circumstantial evidence of retaliatory intent," there generally must be something more than timing alone to support an inference of retaliatory intent. *Pratt v. Rowland*, 65 F.3d at 808. Retaliation is not established simply by showing adverse activity by defendant after protected speech; plaintiff must show a nexus between the two. *Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000) (a retaliation claim cannot rest on the logical fallacy of post hoc, ergo propter hoc, i.e., "after this, therefore because of this").

16

There are several issues of fact which preclude summary judgment on this issue.  First, Mr. Stewart filed a number of grievances in the time period leading up to his dismissal.  (Doc. 88-1 at 15-23.)  In addition, he admits he encouraged his blockmates to submit similar grievances.  (Doc. 11 at 31, Doc. 88-1 at 25-28.)  Mr. Stewart also indicates that just days before firing and right at about the time UM Jovanovich would have received the grievances from Mr. Stewart's blockmates, UM Jovanovich confronted Mr. Stewart about filing grievances stating that he did not want Mr. Stewart to file them because they are a lot of work to process.  Mr. Stewart contends that just after this UM Jovanovich would have read through the grievances on his desk and realized that Mr. Stewart had encouraged others to file grievances on the clothing shortage issue.  (SDF 33.)

The timing of Mr. Stewart and the other prisoners' grievances regarding laundry issues, the timing of UM Jovanovich's alleged statement regarding the amount of work it took to process grievances, and the timing of UM Jovanovich's responses to the laundry grievances (the same date that Mr. Stewart was fired) all tend to support an inference of retaliatory intent.

Finally, there are disputed issues of material fact regarding whether Mr. Stewart was removed from his laundry position for a legitimate penological reason.  Defendant argues that Mr. Stewart was dismissed for a legitimate

correctional reason because he was distributing extra laundry to prisoners in violation of prison rules.  But Mr. Stewart denies this allegation and contends that he never distributed extra laundry or violated prison rules.  While both Sgt. McDonald and UM Jovanovich testified that Mr. Stewart was distributing extra bed rolls, their statements to this effect are somewhat vague.  First, UM Jovanovich testified that "On occasion, I identified that the laundry workers, including Stewart, were making special bed rolls for specific inmates." (Jovanovich Affidavit, Doc. 76-1 at 2, ¶ 4.)  However, he provides no details regarding when or how he made this identification.

Sgt. McDonald testified that he "observed Inmate Stewart making special bed rolls" and that "[s]ome of these special bed rolls identified specific inmates for whom they were made, including some identification by gang monikers." (McDonald Aff., Doc. 76-2 at 5, ¶¶ 29-30.)  But again Sgt. McDonald does not indicate when these observations occurred or provide any additional details regarding the circumstances.

As stated, Mr. Stewart disputes that he ever made special bed rolls for prisoners and he denies that any prison official ever gave him a warning to cease doing so.  He explained that on one occasion UM Jovanovich saw a list of prisoners and asked Mr. Stewart and Mr. Lout about the list but they provided an

18

explanation and UM Jovanovich simply told them that he did not want them to use lists.  (SDF at 18.)

Thus, there is a disputed issue of fact regarding whether there was a legitimate penological reason for firing Mr. Stewart from his laundry job.

### B.  Qualified Immunity

UM Jovanovich seeks summary judgment based upon the doctrine of qualified immunity.  The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  A court considering a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of an actual constitutional right and whether such right was clearly established such that it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  "[U]nder either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," and must, as in other cases, view the evidence in the light most favorable to the non-movant.  *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (per curiam).

As discussed above, drawing "all inferences supported by the evidence in

favor of" Mr. Stewart, there is a disputed issue of fact regarding whether UM Jovanovich violated Mr. Stewart's First Amendment rights.

In considering whether those rights were clearly established, the inquiry must focus on the time of the conduct, i.e., whether the officer's acts were reasonable in light of the information he possessed at the time he acted, rather than its aftermath and effect because no officer can observe whether his retaliation has successfully chilled a prisoner's rights until long after deciding to act. *Rhodes*, 408 F.3d at 570.

It was clearly established in April 2015 that retaliating against a prisoner for his use of the prison grievance system violates a prisoner's constitutional rights. *Rhodes*, 408 F.3d at 567; *Pratt*, 65 F.3d at 806 (stating the "prohibition against retaliatory punishment is 'clearly established law' in the Ninth Circuit, for qualified immunity purposes"); *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009) ("Retaliation against prisoners for their exercise of [the First Amendment right to file prison grievances] is itself a constitutional violation, and prohibited as a matter of 'clearly established law.' " (citation omitted)).

Viewing the evidence in the light most favorable to Mr. Stewart, it would have been clear to a reasonable prison official that directing Sgt. McDonald to fire Mr. Stewart because he filed grievances was unlawful at the time it occurred.

20

Accordingly, UM Jovanovich is not entitled to summary judgment on this claim

Based upon the foregoing, the Court issues the following:

## RECOMMENDATIONS

1.  Defendant Jovanovich's Motion for Summary Judgment (Doc. 74)

should be DENIED.

2.  Plaintiff Stewart's Cross Motion for Summary Judgment (Doc. 87)

should be DENIED.

## NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATIONS AND CONSEQUENCES OF FAILURE TO OBJECT

The parties may file objections to these Findings and Recommendations

within fourteen (14) days after service (mailing) hereof.[4]  28 U.S.C. § 636.  Failure

to timely file written objections may bar a de novo determination by the district

judge and/or waive the right to appeal.

This order is not immediately appealable to the Ninth Circuit Court of

Appeals.  Any notice of appeal pursuant to Fed.R.App.P. 4(a), should not be filed

---

[4]Rule 6(d) of the Federal Rules of Civil Procedure provides that "[w]hen a party may or must act within a specified time after being served and service is made under Rule 5(b)(2)(C) (mail) . . . 3 days are added after the period would otherwise expire under Rule 6(a)."  Therefore, since Mr. Stewart is being served by mail, he is entitled an additional three (3) days after the period would otherwise expire.

until entry of the District Court's final judgment.

DATED this 9th day of May, 2018.


_/s/ John Johnston_____
John Johnston
United States Magistrate Judge